**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEYS FOR APPELLANTS:

**FAY SCHWARTZ**
Middlebury, Indiana

**NANCY A. MCCASLIN**
McCaslin & McCaslin
Elkhart, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

**SERGIO A. LOPEZ**
Elkhart, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION THE PARENT-CHILD RELATIONSHIP OF: N.T. (Minor Child) | ) ) ) |
| And | ) ) |
| D.T. (Father) E.L. (Mother) | ) ) ) |
| Appellants-Respondents, | ) ) |
| vs. | )   No. 20A03-1106-JT-278 ) |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) |
| Appellee-Petitioner. | ) ) ) |

APPEAL FROM THE ELKHART CIRCUIT COURT – JUVENILE DIVISION
The Honorable Terry C. Shewmaker, Judge
Cause Nos. 20C01-1101-JT-3, 20C01-1101-JT-4, 20C01-1101-JT-5 & 20C01-1101-JT-6

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**VAIDIK, Judge**

## Case Summary

D.T. ("Father") and E.L. ("Mother") appeal the involuntary termination of their parental rights to their respective children. Concluding that the Indiana Department of Child Services, local office in Elkhart County ("ECDCS"), presented clear and convincing evidence to support the trial court's judgment, we affirm.

## Facts and Procedural History

Mother is the biological mother of N.T., born in August 2009, L.L., born in July 2006, A.M., born in December 2004, and K.M., born in March 2003. Father is the biological father of N.T.[1] The facts most favorable to the trial court's judgment reveal that L.L., A.M., and K.M. were removed from Mother's care in May 2009 because the family home had no electricity or water and there was very little food in the home. The children were subsequently adjudicated children in need of services ("CHINS"), and temporary wardship of the children was placed with ECDCS.

By July 2009, the conditions in the family home had improved enough that the trial court directed the children to be returned to Mother's physical care as in-home CHINS as part of its dispositional order. The trial court's dispositional order also

---

[1] L.L.'s biological father is unknown. L.M. is the biological father of A.M. and K.M. The parental rights of the three older children's biological fathers were involuntarily terminated by the trial court in its termination order. L.M., however, does not participate in this appeal. We therefore limit our recitation of the facts to those pertinent solely to Father's (D.T.'s) and Mother's appeal.

incorporated a parental participation plan which required Mother to successfully complete a variety of tasks and services designed to address her parenting deficiencies.

In November 2009, all the children, including then-two-month-old N.T., were again taken into protective custody after ECDCS substantiated reports of drug use in the home in the children's presence. During its investigation of the matter, ECDCS also discovered that the children's live-in uncle had recently been arrested at the family home on several drug-related charges, including possession of and dealing in cocaine. In addition, the ongoing ECDCS case manager for the three older children informed the assessment caseworker that service providers had expressed continuing concerns regarding the older children's poor hygiene and sporadic school attendance. Subsequent hair follicle drug screens revealed that L.L. had tested positive for opiates, cocaine, and THC. A.M. and K.M. were both positive for cocaine. Mother did not give permission for infant N.T. to be drug tested. At the time of the children's removal, Father was unavailable to care for N.T. because he was incarcerated in the State of Georgia on charges involving terrorist threats and acts and possession of a firearm.

ECDCS filed a CHINS petition pertaining to N.T. in November 2009. The next month, N.T. was formally removed from both Mother's and Father's custody pursuant to a dispositional order. The trial court's dispositional order as to N.T. was substantially similar to the dispositional orders pertaining to the older three children and again directed Mother to participate in a variety of services designed to enhance her parenting skills and to facilitate reunification. These services included, among other things: (1) obtaining and maintaining, safe, stable, and drug-free housing; (2) securing a stable source of income;

(3) successfully completing parenting classes; (4) participating in home-based counseling services; and (5) exercising regular supervised visitation with N.T. As for Father, the trial court's dispositional order directed him to establish paternity of N.T. and pay $63.00 per week for child support. The child support order, however, was stayed until Father's release from incarceration.

Mother's participation in services was sporadic from the beginning and ultimately unsuccessful. Mother participated in a court-ordered psychological parenting evaluation in September 2009, but she failed to consistently engage in and/or benefit from the recommended treatment, including individual counseling, support groups, and home-based therapy, to address her significant parenting and interpersonal deficiencies as they related to her: (1) experiences as a victim of physical abuse, both as a child and as an adult; (2) below-average IQ and recurrent struggles with sound decision-making; (3) personality disorder with paranoid, avoidant, and masochistic personality traits; (4) rigid authoritarian parenting attitude, lack of empathy, and other parenting issues. Although Mother eventually completed parenting classes, she was unable to consistently demonstrate the skills taught. Consequently, it was recommended that she retake the course. Mother declined to do so. In addition, home-based counseling services were ultimately discontinued as unsuccessful in the fall of 2010 after Mother threatened to harm the home-based therapist. Father, on the other hand, did not participate in any reunification services and remained incarcerated throughout the duration of the underlying proceedings.

ECDCS eventually filed petitions under separate cause numbers seeking the involuntary termination of Mother's and Father's parental rights to their respective children in February 2011. A consolidated evidentiary hearing pertaining to all four children was held in June 2011. During the termination hearing, ECDCS presented substantial evidence establishing that Mother and Father remained incapable of providing the children with a safe and stable home environment. Specifically, ECDCS's evidence showed Father was still incarcerated with an earliest projected release date of February 2013, nearly two years following the termination hearing. In addition, Father had never seen nor spoken to N.T., and there was no evidence Father had ever participated in and/or successfully completed any parenting classes, substance-abuse treatment programs, or any other self-improvement courses while incarcerated.

As for Mother, ECDCS presented evidence that Mother had failed to benefit from the wealth of services available to her for approximately two years during the underlying CHINS and termination cases. Specifically, Mother attended but failed to benefit from parenting classes, refused to consistently engage in home-based counseling services, and remained either unwilling or unable to make the changes necessary to ensure that the children would be safe if returned to her care. In addition, Mother never achieved stable housing and employment, failed to participate in any classes to address the recurrent pattern of domestic violence in her life, continued to struggle with healthy decision-making, and was never able to progress past supervised visits with the children.

At the conclusion of the termination hearing, the trial court took the matter under advisement. On June 15, 2011, the trial court entered its judgments terminating Father's

5

parental rights to N.T. and Mother's parental rights to all four children. This appeal ensued.

**Discussion and Decision**

When reviewing termination of parental rights cases, we will neither reweigh the evidence nor judge witness credibility. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

Here, in terminating Mother's and Father's parental rights, the trial court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *L.S.*, 717 N.E.2d at 208.

The "traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. These parental interests, however,

6

are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001).

Before an involuntary termination of parental rights may occur in Indiana, the State is required to allege and prove, among other things:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). "The State's burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2). If the trial court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall

7

terminate the parent-child relationship. Ind. Code § 31-35-2-8(a). Mother and Father do not challenge any of the trial court's specific findings pertaining to the above-cited elements as unsupported by the evidence. Rather, they simply assert that there is insufficient evidence to support the trial court's conclusions as to subsections (b)(2)(B) through (D) of the termination statute cited above. *See* Ind. Code § 31-35-2-4(b)(2). We shall address each allegation in turn.

### Conditions Remedied/Threat

We begin our review by observing that Indiana Code section 31-35-2-4(b)(2)(B) requires a trial court to find that only one of the three elements of subsection (b)(2)(B) has been established by clear and convincing evidence before properly terminating parental rights. *See L.S.*, 717 N.E.2d at 209. Because we find it to be dispositive under the facts of this case, we only consider whether ECDCS established, by clear and convincing evidence, that there is a reasonable probability the conditions resulting in the children's removal and/or continued placement outside each parent's care will not be remedied. *See* I.C. § 31-35-2-4(b)(2)(B)(i).

A trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The trial court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.* Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment.

8

*A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied.* Moreover, a county department of child services is not required to provide evidence ruling out all possibilities of change; rather, it need only establish that there is a reasonable probability the parent's behavior will not change. *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). Finally, we have previously explained that Indiana's termination statute makes clear that "it is not just the basis for the initial removal of the child that may be considered for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside of the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied.*

Here, in determining that there is a reasonable probability the conditions leading to the children's removal and/or continued placement outside Mother's and Father's respective care will not be remedied, the trial court made several pertinent findings regarding both parents' past and present inability to provide the children with a safe and stable home environment. Regarding Father, the trial court specifically noted that N.T. had "never" been in Father's care and that Father had been incarcerated since the time N.T. was removed from the family home. Appellant's App., Vol. 1, p. 25.[2] The court further found that although "most" of the testimony presented during the termination hearing related to Mother, testimony from ECDCS case manager Cindi Callan confirmed that Father had: (1) been incarcerated in the State of Georgia for "Terrorist Threats and

---

[2] We note that although the trial court issued judgments under separate cause numbers for each of the children, the findings referred to herein are substantially similar in each judgment. We therefore cite only to the judgment pertaining to N.T.

9

Acts" and "Possession of Firearm" convictions; (2) not seen N.T. "since the initiation of this case;" (3) "never been involved in services;" (4) an "earliest possible release date" in February 2013; and (5) "will have lived four years outside of the care of a parent" by the time he is released from incarceration, N.T. *Id.* at 31, 33-34. We have repeatedly recognized that "[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 375 (Ind. Ct. App. 2006), *trans. denied*.

As for Mother, the trial court made exhaustive findings pertaining to Mother's "continued inadequate housing" throughout the duration of the case, failure to follow through "with any of the services offered," apart from submitting to the psycho-parenting assessment, continuous "use of inappropriate language" and inability to re-direct the children during visits, persistent "unwilling[ness] to take suggestions and make necessary changes, and "refusal to recognize her own shortcomings, making it unlikely that she will change in the future." Appellant's App., Vol. 1, p. 26-28, 30. The trial court's findings also incorporated case managers Callan's and Susan Allen's testimony regarding Mother's refusal to retake the parenting educations classes after instructors reported Mother did not appear to be learning the information being taught as well as Mother's "failure" to make the progress "expected" and "necessary" to demonstrate she was able to "provide for the children's needs" and "keep her children safe." *Id.* at 28, 30. In addition, the trial court specifically noted Callan's testimony that "out of concern for the children" neither Callan nor any other service provider ever recommended Mother's

10

visits be "extended or that visits progress to unsupervised visits" as well as Callan's "concern" that Mother "never acknowledged that she had any role in the reason that her children were twice removed from her care." *Id.* at 30.

The trial court also relied on the testimony of court-appointed special advocate ("CASA") Wendy Silver finding Silver had "put it succinctly" when she testified that "nothing has changed with the mother since the beginning of the case." *Id.* The court thereafter determined that the "children were removed because [Mother] was unable to care for them. Because nothing has changed, [Mother] continues to be unable to care for them today." *Id.* at 31. A thorough review of the record reveals that these findings and conclusions are supported by abundant evidence.

Testimony from various ECDCS case managers, service providers, the CASA, and even Mother's own testimony makes clear that, at the time of the termination hearing, Mother's circumstances and ability to care for the children remained largely unchanged. Since the time of the children's removal, Mother had lived in six different homes. At the time of the termination hearing, Mother was living with her sister and two children in a two-bedroom apartment that was deemed inadequate for her children. Additionally, Mother was unemployed, had only recently begun individual therapy, and had never participated in any programs to address the recurrent theme of domestic violence in her life.

In recommending termination of Mother's parental rights, Callan informed the trial court that she had not seen "any improvement" in Mother's "attitude or behavior," including Mother's ability to provide for the children's "basic needs," "safety," and

11

"emotional" well-being. Tr. p. 380. Mother's lack of progress was likewise confirmed by current ECDCS family case manager Susan Allen who testified that although ECDCS wanted to see the children returned home, such a recommendation was never made because "[ECDCS] just didn't see the progress that we needed to." *Id.* at 312. Allen further testified that she believed Mother's "own upbringing," "lack of parenting skills," and "established patterns" of behavior prevented Mother from making the progress needed "to insure [sic] that the kids would be safe in her care." *Id.*

Mother's own testimony lends further support to the trial court's findings. During the termination hearing, Mother emphatically denied that the children had ever exhibited any of their current behavioral issues before their removal from her care. In so doing, Mother claimed, "Before my kids went into foster care[,] . . . none of these problems," such as "setting fires" and "peeing on" themselves ever happened. *Id.* at 401-402. Moreover, when asked how she planned on meeting the children's physical, financial, and emotional needs if they were returned to her care in the future, Mother replied, "like before." *Id.* at 399.

Where a parent's "pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). Based on the foregoing, we conclude that ECDCS presented clear and convincing evidence to support the trial court's findings cited above, including its determination that there is a reasonable probability the conditions resulting in the children's removal and continued placement outside both Mother's and Father's care will not be remedied. These findings, in turn, support the

12

court's ultimate decision to terminate both Mother's and Father's parental rights to their respective children. The parents' arguments to the contrary amount to impermissible invitations to reweigh the evidence. *See D.D.*, 804 N.E.2d at 264.

### Best Interests

We next consider Mother's and Father's assertions that ECDCS failed to prove termination of their parental rights is in the children's best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the Indiana Department of Child Services and look to the totality of the evidence. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the trial court must subordinate the interests of the parent to those of the child. *Id.* A trial court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* at 199. Moreover, we have previously held that the recommendations of both the case manager and child advocate to terminate parental rights, coupled with evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *In re M.M.*, 733 N.E.2d 6, 13 (Ind. Ct. App. 2000).

In addition to the specific findings previously cited, the trial court made several additional pertinent findings in determining that termination of Mother's and Father's parental rights is in the children's best interests. Specifically, the court found found that the permanency plan changed to termination of parental rights in September 2010

13

because Mother had "failed to make the progress expected and necessary to keep her children safe." Appellant's App. p. 30. Although the court's findings acknowledged Mother's recent participation in weekly therapy sessions, the court also specifically acknowledged that Callahan had "stated firmly" that Mother's recent participation in therapy had not "alleviated" Callahan's concerns over Mother's ability to care for her children, detailing Callahan's testimony that "even on short visits . . . with her children, the visits are chaotic, and [Mother] relies heavily on the help of the visit supervisors to care for her children . . . ." *Id.* at 30.

As for the children, the trial court recounted testimony concerning the older children's "problems and behaviors" since removal from Mother's care and further found that these behaviors "raise[d] serious concerns for [N.T.] as well." *Id.* at 31. In so doing, the trial court noted testimony that L.L. "never wanted to visit his mother" following his removal from her care and would "scream 'no' over and over again" when told he was going to visit with Mother. *Id.* The court also acknowledged the testimony from K.M.'s and A.M.'s therapist that: (1) both children "never" talked about Mother in therapy unless the therapist "force[d] the discussions," which was highly unusual for children their ages; (2) K.M. and A.M. had both been "exposed to sexual behaviors" while in Mother's home and each child could "graphically describe sexual acts," despite their tender age; and (3) visits with Mother often "trigger[ed] severe acting out behaviors" by the children, including eight-year-old K.M setting fire in the foster home on two occasions and soiling her pants following visits with Mother and six-year-old A.M. becoming "violent" after visits. *Id.* at 32. The trial court further acknowledged in its findings case manager

14

Allen's testimony that Mother had been unable to provide the children with the "nurturing, structure, or the rules required by any child," as well as CASA Silver's testimony that Mother still "cannot meet the basic or emotional needs of her children." *Id.* As for Father, the trial court found he "can do no better for [N.T.] at this point in time" than Mother in meeting the child's basic or emotional needs, "as evidenced by his absence." *Id.* at 33. Thereafter, the trial court found that the children "need the protection afforded by the termination of parental rights." *Id.* at 34. These findings, too, are supported by the evidence.

During the termination hearing, therapist Idah Gudyanga testified regarding A.M.'s and K.M.'s significant emotional needs and acting out behaviors. Gudyanga explained that initially, A.M. kept her emotions "bottled up" but that K.M. would "act out" by "bust[ing] windows," starting fires, and "putting dangerous stuff" in her bed, like razors. Tr. p. 265-266, 268. Similarly, L.L.'s therapist, Sara Atkinson, confirmed that L.L. exhibited "very, very violent" behaviors upon his removal from Mother and would "hit, bite, kick, [and] push other kids down" at daycare. *Id.* at 296. L.L. would also kick and bruise his teachers "regularly" and would scream "no, no, no" when told he was going to visit with Mother. *Id.* at 296, 298. When asked what type of caregiver the children needed, Gudyanga stated that she believed they needed a caregiver who was "nurturing, caring," and could "offer a stable environment." *Id.* at 277. When further questioned as to whether she could recommend that A.M. and K.M. be returned to Mother at this point, Gudyanga replied, "Today, I would not make that recommendation." *Id.* at 285.

15

ECDCS case managers Allen and Callan also recommended termination of Mother's and Father's parental rights to the children. When asked during the termination hearing why ECDCS believed it was in N.T.'s best interests that Father's parental rights be terminated, Callan answered, "[Father] is not able to provide a safe and stable home for [N.T.] as he is incarcerated . . . ." *Id.* at 214. Similarly, when asked if she, too, believed termination of parental rights was in the children's best interests, Allen answered in the affirmative and explained, "[N]o real progress has been made. We needed to insure that the children would have . . . permanency in a safe, stable home[,] and that just was not possible" with either parent. *Id.* at 328. Finally, in recommending termination of Mother's and Father's respective parental rights to the children, CASA Silver informed the trial court, "Neither of them are able to care for the children . . . ." *Id.* at 215.

Based on the totality of the evidence, including: (1) Father's ongoing incarceration and lack of any sort of relationship with N.T.; (2) Mother's unresolved parenting and mental-health issues; and (3) both parents' current inability to provide any of the children with a safe and stable home environment, coupled with the testimony from Allen, Callan, and Silver recommending termination of Mother's and Father's parental rights to their respective children, we conclude that clear and convincing evidence supports the trial court's determination that termination of Mother's and Father's parental rights is in N.T.'s, A.M.'s, K.M.'s, and L.L.'s best interests.

**Satisfactory Plan**

Finally, we consider Mother's and Father's assertions that ECDCS failed to prove it has a satisfactory plan for the children's future care and treatment. In making this argument, both parents claim that ECDCS failed to meet its statutory obligations as to subsections (b)(2)(B) and (C) of Indiana's termination statute. Both parents therefore contend that because their parental rights should never have been terminated in the first place, adoption is not a satisfactory plan under the facts of this case.

Indiana Code section 31-35-2-4(b)(2)(D) provides that before a trial court may terminate a parent-child relationship, it must find there is a satisfactory plan for the future care and treatment of the child. It is well established, however, that this plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. *Id.* ECDCS's plan for all four children is adoption, preferably by one family. This plan provides the trial court with a general sense of the direction of the children's future care and treatment. ECDCS's plan is therefore satisfactory. *See id.* (concluding that the State's plan for child to be adopted by current foster parents or another family constitutes a suitable plan for future care of child).

This Court will reverse a termination of parental rights "'only upon a showing of 'clear error'– that which leaves us with a definite and firm conviction that a mistake has been made.'" *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here.

17

Affirmed.[3]

ROBB, C.J., and NAJAM, J., concur.

---

[3] Father's additional allegation that he was denied due process of law when "no options [for] transportation to the termination hearing were afforded to him by the [trial] court" is likewise unavailing. *See* Appellant Father's Brief p. 5. The record makes clear that despite being represented by counsel in both the CHINS and termination proceedings, Father never sought permission from the trial court to be transported to Indiana to attend the termination hearing. Nor did Father request that arrangements be made for him to participate in the termination hearing by any other means. Also significant, counsel for Father never objected to the trial court proceeding with the termination hearing in Father's absence either before or during the termination hearing. Instead, Father raises this procedural due process argument for the first time on appeal, thereby denying the trial court an opportunity to address Father's allegation of error. Based on the foregoing, we find no occasion to consider Father's due process argument now. Accordingly, we deem the issue waived. *See McBride*, 798 N.E.2d at 194-95 (stating it is well-established that a party on appeal may waive a due process claim in a CHINS or involuntary termination case when the argument is raised for the first time on appeal).